RICHARD W. MARSHALL ᴇᴛ ᴀʟ. *v.* JOHN J. FITZGERALD ᴇᴛ ᴀʟ.

[No. 110, September Term, 1980.]

*Decided December 10, 1980.*

The cause was argued before MORTON, MOORE and WEANT, JJ.

*William T. Rooker, Jr.,* with whom was *Donald E. Fitzgerald* on the brief, for appellants.

*John J. Delaney,* with whom were *William Kominers* and *Linowes & Blocher* on the brief, for appellees Fitzgerald et al. *Howard J. Thomas,* with whom were *Bradshaw, Thomas & Yeatman* on the brief, for appellee Wildwood Hills Citizens Association. *Paul A. McGuckian, County Attorney for Montgomery County, Robert G. Tobin, Jr., Deputy County Attorney for Montgomery County,* and *Ralph E. Hall, Jr., Assistant County Attorney for Montgomery County,* on the brief, for appellee Montgomery County, Maryland.

MOORE, J., delivered the opinion of the Court.

The question presented in this appeal is whether the Circuit Court for Montgomery County erred in affirming a decision rendered by the Montgomery County Council, sitting as the District Council, granting applications for the rezoning of two parcels of land in Bethesda, aggregating approximately 22.2 acres, from the R-200 Zone (residential, one-half acre) to the RT-8 Zone (townhouse), applications for townhouse zoning having been denied some five years earlier.

## I *The Property*

The subject property consists of two contiguous parcels, containing 6.7258 and 15.4802 acres, respectively, technically divided by a dedicated but unimproved right-of-way comprising 1.84 acres, which reduces the net buildable area to 20.38 acres. The property is located in the southwest and southeast quadrants of the intersection of Democracy Boulevard and Westlake Drive in Montgomery County, Maryland, and is within Neighborhood VCIV of the Cabin John Master Plan. The unimproved right-of-way is for the extension of Westlake Drive across Democracy Boulevard.

The property fronts on Democracy Boulevard, a major six-lane divided highway running in an east-west direction. Directly opposite the site, across Democracy Boulevard, is the Montgomery Mall Regional Shopping Center consisting

of 1,000,000 square feet of gross leasable area. To the east of the Mall, across Interstate 270, is the 270-acre "Davis Tract," an existing office building and shopping center complex which currently includes C-1 (Convenience Commercial), C-P (Commercial Office Park), I-3 (Industrial Park), and R-H (Multiple-Family, High-Rise Planned Residential) zoning over various areas. North of the Mall is a 28.8 acre parcel classified C-2 (General Commercial) to permit the development of an automobile "Motor Mall."

Across the existing portion of Westlake Drive, west of Montgomery Mall, is a large area of townhouse, high-rise apartment and mid-rise apartment uses zoned R-20 (Multiple-Family, Medium Density Residential), R-30 (Multiple-Family, Low Density Residential) and R-H. To the west of that area is the Cabin John Regional Park.

To the south of the property, and separated from it by Bells Mill Road, is Wildwood Hills, a 36 home R-200 subdivision. The Wildwood Hills Citizens Association supported the applications below and on this appeal, by separate counsel. Five of the appellants, however, are property owners in Wildwood Hills. South of the property and west of Wildwood Hills is the Bethesda Country Club and Golf Course. West of the Country Club are the subdivisions of Ashleigh and Knollwood containing single-family dwellings. The instant applications were also opposed by the Ashleigh Community League. Both subdivisions and the Country Club are zoned R-200.

## II *Zoning History*

In 1958 the subject property and all other property within Neighborhood VCIV of the Cabin John Master Plan was, by a Sectional Map Amendment (No. B-573), reclassified from the R-A zone (Agricultural Residential, Two Acre) to the R-R zone (Rural Residential, Half-Acre), now designated as R-200.

Ten years later, the first of three attempts was made to reclassify the property to permit the construction of townhouses. The 1968 applications (F-305 and F-306) were

part of a larger package of seven applications and requested a change to the R-T zone (12.5 dwelling units per acre). The Technical Staff of the Montgomery County Planning Board recommended their denial or deferral pending completion of certain Master Plan revisions but the Planning Board recommended approval. Prior to a final decision by the District Council, all seven applications were withdrawn, by permission, on May 25, 1971.

The next chapter in the zoning history of the property began on November 28, 1972 when the current applicants, the appellees herein, filed applications F-872 and F-873 for reclassification to C-3 (Highway Commercial) or, in the alternative, R-T (Townhouse). At that time, the R-T zone was the county's only townhouse zone and permitted a density of 12.5 units per acre. Subsequent to the filing of the applications, the Council adopted a Resolution providing an allowance of twenty per cent more units for the inclusion of Moderately-Priced Dwelling Units (MPDU's), thus permitting a density of 15 R-T units per acre.[1] The Technical Staff and the Hearing Examiner recommended R-T approval but the Planning Board, in a reversal of its prior action, recommended denial on the ground that the 12.5 units per acre would create a density use higher than would be compatible with the surrounding residential areas. The District Council denied the applications on August 20, 1974. The applicants appealed to the Circuit Court for Montgomery County and the denials were upheld (Shearin, J.). This Court affirmed in *Fitzgerald v. Montgomery*

---

1. Under the MPDU program, the county requires developers who plan to build more than 50 units in a subdivision to set aside 15 per cent of them for moderate-income residents. Of that 15 per cent, the County's Housing Opportunities Commission has the right to purchase one-third either to sell or to rent to low and moderate income households. The other two-thirds are sold directly to moderate-income families by the developer. For setting aside the units, the developer is allowed to build 20 per cent more units than the zoning classification normally allows. Montgomery County, Md., Code, § 25A (1972, 1977 Repl. Vol., 1979 Cum. Supp.).

The MPDU law became effective on January 21, 1974, some seven months before the District Council's denial of applications F-872 and F-873. If the applications had been granted for R-T zoning, the density could have been increased under the 20% "bonus" provisions.

*County,* 37 Md. App. 148, 376 A.2d 1125, decided on September 7, 1977, in an opinion by Judge Mason.[2]

Approximately nine months later, the District Council adopted a Zoning Text Amendment (Ordinance No. 8-71), effective June 13, 1978, which redesignated the R-T zone into four separate RT categories based upon varying densities, as follows:

| RT | 12.5 | |
|----|------|---|
| RT | 10 | (The numerals indicate the |
| RT | 8 | maximum densities within |
| RT | 6 | each category.) |

Referring to the Text Amendment, Hearing Examiner Abrams' report in the proceedings below states:

> "The adoption of this text amendment was at least in part in answer to the denial of the prior R-T applications on the subject property. The new R-T zones were developed to provide the opportunity for applicants seeking town house zoning to apply for a lesser dwelling unit density on tracts where development at 12.5 units per acre was deemed undesirable. By providing additional R-T density categories this permitted increased locational flexibility within this form of zoning district and development thereon."

The applications which are the subject of this appeal, Nos. G-142 and G-143, were filed on August 30, 1978, some two and one-half months after the adoption of the Text Amendment. They sought a zoning reclassification from R-200 to RT 8 — a permissible density of 8 dwelling units per acre plus the 20% "bonus" for MPDU's, a maximum density of 9.6 dwelling units per acre.

The Technical Staff, the Planning Board and the Hearing

---

2. This Court held that density of use, the principal issue considered by the Council, was a valid consideration in determining whether the R-T zone was compatible with the adjacent R-200 zone. Certiorari was denied, 281 Md. 737, 439 U.S. 854.

Examiner [3] recommended approval and, on March 27, 1979, the District Council adopted a resolution granting the reclassification in each application. Appellants again appealed to the circuit court. On December 20, 1979, the court (Shearin, J.) affirmed, finding a "substantial change in the structure of the zoning ordinance relating to townhouses. * * * The Court has concluded in fact and in law they (the old and new R-T classifications) are substantially different. A difference of some 30-odd per cent in density standing alone is, by any rational test, substantial." ·

The principal thrust of this appeal is that the 1978 applications were for substantially the same rezoning as was the subject of the 1972 applications which had been denied, and that successive applications are barred by res judicata.

### III *Res Judicata Issue*

Provisions of zoning ordinances generally set a time, after approval or denial of an application, within which a new application may be filed.[4] It is settled law in Maryland that such provisions do not dispense with the rule of res judicata. *The Chatham Corp. v. Beltram,* 243 Md. 138, 220 A.2d 589 (1966); *Woodlawn Area Citizens Ass'n, Inc. v. Board of County Commissioners for Prince George's County,* 241 Md. 187, 216 A.2d 149 (1966); *Whittle v. Board of Zoning Appeals of Baltimore County,* 211 Md. 36, 125 A.2d 41 (1956). Under that rule, the zoning authority may grant the reclassification after the lapse of the specified time only if there has been a substantial change in conditions. As Chief Judge Brune explained in *Whittle:*

> "[W]here the facts are subject to changes which might *reasonably* lead to an opposite result from that arrived at in an earlier case, and if there have been *substantial* changes in fact and circumstances

---

**3.** The comprehensive report of the Hearing Examiner consumes 38 pages of the Record Extract.

**4.** In Montgomery County, the period is eighteen months. Montgomery County, Md., Code, § 59-H-2.23(a) (1972, 1977 Repl. Vol.).

between the first case and the second, the doctrine of res judicata would not prevent the granting [of the second application]. . . ." (Emphasis added.)

*Id.* at 45, 125 A.2d at 46.

The narrow question before us on this appeal, therefore, is whether there was a "substantial" change in conditions between the denial of the first applications (F-872, F-873) in 1974 and the granting of the second applications (G-142, G-143) in 1979. The lower court specifically addressed this issue and found in the affirmative, on the basis of a "substantial" reduction in allowable density. In our view, the record amply supports Judge Shearin's conclusions.[5]

At the outset, we observe that the density factor involved in the applications denied in 1974, when the only R-T density allowed was 12.5 units per acre, loomed large in the Council's consideration of the earlier cases. The Resolution of denial recited in part:

"The .proposed R-T zoning [12.5 units per acre] would permit a much higher density of development than provided for this tract and area in the Master Plan for the Cabin John Watershed."

In the grant of the RT-8 application in 1979, the District Council recorded its awareness of its previous action and its perception of the significance of the change in the text of the zoning ordinance in the interim. The District Council's 1979 Resolution stated, in this respect:

"The District Council is cognizant of its prior denial of R-T zoning for these parcels in August, 1974 but distinguishes the subject applications on the basis of the *lower permissible density* and more compatible nature of the subject applications as compared to the prior applications in Case Nos. F-872 and F-873." (Emphasis added.)

---

5. The court in its oral opinion adopted as the basis for its decision a ten-page portion of the appellees' Trial Memorandum which, *inter alia*, developed the point that the "RT-8 zone provides significantly lower density on the subject property than the old RT zone would have provided prior to its amendment."

The analysis by the Zoning Hearing Examiner of the density question in the 1979 cases, an analysis with which the Council in its Resolution expressly stated its agreement, disclosed "an approximate 30% reduction in overall density between the prior applications and the subject applications," assuming maximum theoretical development of 195 units [6] (including the MPDU "bonus"), as compared with an allowable 275 units [7] (not including MPDU's) in the 1974 cases. (The Examiner also found that under the development plan of the applicants which proposed a 172-unit maximum development (including MPDU's) in the 1979 cases, a 38% reduction from the maximum (275) in the prior zoning cases would result.)

Appellants assail the District Council's action in granting the applications in 1979, and the circuit court's affirmance, claiming that the Council's later action represented a "mere change of mind." They contend, in essence, that the Council merely disapproved a 200-unit townhouse development in 1974 and approved a 172-unit development in 1979. The fallacy in their position is that they are employing not the figures representing the maximum allowable densities in the respective years, but the number of units proposed by the applicants in their site plans for the 1974 (200 units) and 1979 (172 units) cases; and, even at that, they compare the 1974 site plan proposal of 200 units *without* the MPDU allowance of 20% (240 units) with the 1979 proposal of 172 units *with* the MPDU allowance.

It is a well settled principle of Maryland law that the District Council was obliged, in its dispositions of these cases in 1974 and, of course, in 1979 to consider the maximum development allowable under the zoning category being requested — and not simply the applicant's site plan and proposed development. Maryland cases have long held that

---

**6.** This figure was calculated by using the gross acreage of 22.22 acres, deducting 1.84 acres for road dedication to achieve a net developable 20.38 acres. This figure, multiplied by 9.6 units per acre (8 under the zoning ordinance and 1.6 under the MPDU law) produced the maximum theoretical development of 195 units on the subject parcels.

**7.** In the analysis of the applications denied in 1974, the Council accepted the Planning Board's projection of 275 units (not including MPDU's which would have resulted in 330 units) which was derived by multiplying 22.22 acres by the then permitted 12.5 units per acre.

zoning decisions based solely upon the proposed development plan of the applicant offend the rule against conditional zoning. *See Montgomery County v. National Capital Realty Corp.,* 267 Md. 364, 373, 297 A.2d 675, 680 (1972); *Hyson v. Montgomery County Council,* 242 Md. 55, 70, 217 A.2d 578, 587-88 (1966). It is the zoning classification for which application is made, not the proposed use, which is controlling. This the District Council clearly recognized. When the Council rejected the old R-T classification in 1974, it was considering a density potential in the two parcels substantially higher — at least 30% — than the density potential inherent in the RT-8 applications in 1979.[8] The issue decided in 1974 was, as the lower court found, substantially different from that before the Council in 1979. Res judicata was, therefore, not a bar to the 1979 grant.

Appellants seek support in the opinion of Judge Hammond, later Chief Judge, in *Woodlawn Area Citizens Ass'n, Inc. v. Board of County Commissioners for Prince George's County,* 241 Md. 187, 216 A.2d 149 (1966), where a rezoning of 47 acres of undeveloped land was denied by the District Council in 1961 but granted in 1964. On appeal, the appellees contended — for the first time in the case — that the R-18 classification (garden-type apartments) for which application had been made, had been changed by legislative enactment after the 1961 denial. The Court of Appeals reversed, finding no significant change in the law that would dispense with the principles of res judicata. "The new definition [of an R-18 zone]," Judge Hammond wrote, "was not formally put before us but the appellees concede that it is like the former one except that the density in an R-18 zone is decreased slightly...." *Id.* at 201, 216 A.2d at 158. Appellants in this case assert in their brief that the maximum allowable density of the R-18 zone in *Woodlawn* "was reduced by nearly 16 per cent."

The Zoning Text Amendment in *Woodlawn* is

---

8. Indeed, if the MPDU "bonus" of 20% had been added to the 275 units found to be the 1974 potential, the total number of units would have been 330. The 1974 density would thus have been 69% higher than the potential of the RT-8 applications in 1979.

significantly different from that involved in the instant case in two respects: 1) the percentage reduction in density, and 2) here, the alteration also extended to the nature and purpose of the zone. First, the density permitted in the new RT-8 classification is substantially lower than the old R-T as the following tabulation discloses:

|  | Maximum Density Permitted *Without* MPDU Bonus | Maximum Density Permitted *With* MPDU Bonus of 20% |
|---|---|---|
| R-T | 12.5 du/ac.[9] | 15.0 du/ac. |
| RT-8 | 8.0 du/ac. | 9.6 du/ac. |
| Unit Reduction | 4.5 | 5.4 |
| Per cent Reduction | 36% | 36% |

In addition to the density changes, the new zones established by the Ordinance of June 13, 1978, *supra,* divided the old R-T (townhouse category) into four separate zoning classifications "to permit more flexible use of this form of development in terms of locational aspects" as pointed out by the Hearing Examiner. It is also to be noted that the purpose clause of the townhouse zone has been altered and that the new classifications are referred to as "residential" zones rather than "multiple-family residential." The difference between a multiple-family residential zone and one which is considered akin to traditional single-family use is significant, as appellees suggest. In our view, there is a substantial difference between the situation presented in *Woodlawn* and that presented in these cases and we, therefore, reject appellants' contention that the lower court misread that case.[10]

> *Judgment affirmed; appellants to pay the costs.*

---

9. Dwelling units per acre.

10. Having decided the merits of this appeal, we deny appellees' motion to dismiss on grounds of mootness based upon an application for a Sectional Map Amendment made by the Maryland-National Capital Park and Planning Commission and granted by the County Council on September 30, 1980. The motion represented that under the Sectional Map Amendment the subject property was rezoned to the RT-8 classification. This representation was controverted by the appellants who maintained that the property remained in the R-200 category.